### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. CR-23-00272-PRW |
| THOMAS LAMARE BROWN, | ) ) ) |
| Defendant. | ) |

### ORDER

Before the Court is Defendant Thomas Lamare Brown's Motion to Suppress (Dkt. 30), seeking to exclude all evidence obtained from a search incident to a traffic stop on April 15, 2023. For the reasons that follow, the Court **DENIES** the motion (Dkt. 30).

### *Background*

In the early morning hours of April 15, 2023, Oklahoma Highway Patrol ("OHP") Trooper Tanner Eads noticed bright fog lights in his rearview mirror from a car behind him. Because Oklahoma law prohibits use of fog lights when there is no fog or similar atmospheric condition, Trooper Eads slowed down, let the car pass, and then initiated a traffic stop.

Defendant Thomas Brown was driving the car. When Trooper Eads told Brown why he had stopped him, Brown expressed some confusion about the location of his fog lights, so Trooper Eads asked him to step out of the car so that he could point them out to Brown. Trooper Eads noticed a large knife in the center cupholder of the car, so he also asked Brown if he had any weapons other than the knife. Brown said no, and then exited the

vehicle. Trooper Eads showed Brown the fog lights, explained when they could be used, and asked Brown to walk back with him to the patrol car so that Trooper Eads could write him a warning. Brown agreed and followed Trooper Eads to his patrol unit.

Because Trooper Eads had noticed the large knife in the car, and because Brown was wearing loose fitting clothing that made it difficult to see if he had any other weapons, Trooper Eads asked Brown if he could pat him down before he got into the patrol car. Brown immediately asked Trooper Eads why he wanted to pat him down. Trooper Eads explained that because of his baggy clothing, he just wanted to make sure that Brown didn't have a weapon on him before he got into the patrol car. Brown responded that this request made him uncomfortable, and that he was now scared.

In an attempt to compromise, Trooper Eads asked Brown if he would just lift up his shirt. Brown agreed and did so, and Trooper Eads noticed what he thought was the clip of an inside-the-waist-band pistol holster on Brown's belt line. Trooper Eads asked Brown what the object was and repeatedly asked Brown to lift his shirt back up so that Trooper Eads could see the clip. Brown replied that it was his eyeglasses and asked Trooper Eads to call a supervisor. Trooper Eads asked if he could see the clip, but Brown refused and again asked Trooper Eads to call a supervisor. Trooper Eads again asked Brown to let him see what was in the clip and told Brown that his behavior was making him uncomfortable. Trooper Eads explained that the clip looked like a handgun holster and told Brown that "this doesn't need to go like this." With tensions escalating, Trooper Eads told Brown that he needed to make sure that it wasn't a weapon, and order Brown to get on the ground so that he could do so, but Brown refused, saying that he had seen "people die like this," and

2

again asked Trooper Eads to call a supervisor. Trooper Eads again told Brown to get on the ground, but Brown refused again, instead began walking towards the rear of the patrol car, and then took off running across the interstate.

Trooper Eads did not pursue Brown, opting instead to shut off the engine of Brown's car and wait for backup while using his patrol unit to try to maintain a visual on the fleeing Brown. While Trooper Eads was in his patrol unit, Brown reappeared running back across the highway towards his car. Trooper Eads followed in his patrol unit, repeatedly ordering Brown to stop, but Brown ignored his commands, ran to his car, jumped into the driver's seat and pressed the brake pedal, in an apparent attempt to flee. But because the car was shut off, and Brown no longer had the key fob, his attempt was unsuccessful. Trooper Eads ordered Brown out of the car, and Brown finally complied and was arrested. An Oklahoma City Police Department ("OCPD") officer who had arrived on scene searched Brown for the clip on his waistband but did not find it.[1]

Brown's car was parked mere inches from the right-hand lane of the interstate highway (so close that when Brown exited the car, he stepped out into the traffic lane), and the key fob to Brown's car hadn't yet been found so there was no way to start the car. Trooper Eads decided to impound and tow the car. While waiting on the wrecker, Trooper Eads and another officer searched the car, looking for the firearm that they suspected Brown had in his possession. Trooper Eads testified that at that point, they did not know

---

[1] A subsequent K-9 search of the wooded area to which Brown had fled located the key fob to Brown's car, a handgun holster, and the sandals that Brown had been wearing.

where the gun was. It was possible that Brown had disposed of the gun when he fled, but it was also possible that he had put it in the car when he returned and attempted to leave the scene. The officers located THC wax and a large knife in the front seat area of the vehicle and two pistols, two rifles, ammunition, and additional THC wax in the trunk of the vehicle. In his report, Trooper Eads noted the contraband that was found, but he did not complete an inventory report for any other things of value in the car.

A federal grand jury returned an indictment against Brown, charging him with one count of felon in possession of firearms. Brown filed a motion to suppress all evidence obtained from his car. Brown does not challenge the legality of the initial stop, but argues that the stop was unnecessarily prolonged and that the subsequent search of his car violated Oklahoma Highway Patrol procedures and was illegal. The Court held a hearing on the motion at which both parties were given the opportunity to introduce evidence. After argument on the legal questions presented, the Court took the matter under advisement.

## *Discussion*

### *I. Duration of the Stop*

Brown claims that Trooper Eads impermissibly extended the stop by performing actions not reasonably related in scope to the circumstances which justified the stop.

The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures,"[2] such as searches or seizures conducted "without

---

[2] U.S. Const. amend. IV.

prior approval by judge or magistrate."[3] A traffic stop "constitutes a 'seizure' under the Fourth Amendment"[4] and is constitutionally "reasonable where the police have probable cause to believe that a traffic violation has occurred."[5] "A traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to 'the mission of the stop itself.'"[6]

Officers should not stop vehicles for any "longer than is necessary" to resolve the traffic violation and handle "related safety concerns."[7] "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."[8] "An officer may not prolong the traffic stop to conduct an unrelated investigation without reasonable suspicion that the detainee is engaged in criminal activity."[9]

Brown first argues that Trooper Eads impermissibly extended the stop by asking Brown to exit the vehicle to view the fog lights. This request was reasonably related in scope to the mission of the stop, which concerned the improper use of fog lights. Showing a driver where his fog lights are located helps ensure that the driver will use those lights

---

[3] *Thompson v. Louisiana*, 469 U.S. 17, 19–20 (1984) (per curiam).

[4] *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)).

[5] *Whren*, 517 U.S. at 809–10.

[6] *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)).

[7] *Rodriguez*, 575 U.S. at 354 (citations omitted).

[8] *Id.*

[9] *United States v. Leon*, 80 F.4th 1160, 1165 (10th Cir. 2023).

properly in the future, especially where, as here, Brown had expressed ignorance about his fog lights. Trooper Eads quickly showed Brown where his fog lights are located and thus did not prolong the stop in doing so.

Brown also argues that Trooper Eads impermissibly extended the stop by asking Brown to walk with Trooper Eads to his patrol car. But, generally speaking, an officer may ask a detainee to sit in or stand next to his patrol car during a traffic stop without unreasonably prolonging the stop.[10] Here, the request to walk back to Trooper Eads' car happened immediately after Trooper Eads showed Brown his fog lights and did nothing to extend the duration of the stop.

## II. *Impoundment of Brown's Vehicle*

Brown next argues that Trooper Eads' impoundment and search of Brown's vehicle violated the Fourth Amendment.[11]

"The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."[12] But when a

---

[10] *United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020) (finding that "nothing suggests any unreasonable delay or delinquency in the manner" the officer conducted a traffic stop in which the officer asked the driver to stand next to his patrol car); *United States v. Hernandez*, 93 F.3d 1493, 1499–1500 (10th Cir. 1996) (listing similar cases); *see also United States v. Santos*, 403 F.3d 1120, 1122 (10th Cir. 2005) (concluding a traffic stop was reasonable even though the officer asked the driver to join him in his patrol car to issue a warning for speeding).

[11] Brown combines his arguments that the impoundment and search of his vehicle violated his Fourth Amendment rights. "[T]hough impoundments and inventory searches often occur sequentially, they are subject to different legal standards." *United States v. Kendall*, 14 F.4th 1116, 1123 (10th Cir. 2021). The Court thus addresses the impoundment and search of the vehicle separately.

[12] *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).

vehicle is *not* impeding traffic or impairing public safety, impoundment of the vehicle is permissible under the Fourth Amendment if a "reasonable, non-pretextual community-caretaking rationale justifies impoundment[.]"[13] This determination is informed by five non-exclusive factors:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.[14]

"When the vehicle is located on public property, specifically including streets, roads, and ways, officers have far greater authority to impound."[15]

First, impoundment of Brown's vehicle was proper because the vehicle was threatening public safety and potentially impeding traffic, as it was parked just inches from the shoulder line of a heavily trafficked interstate highway late at night. Had law enforcement not impounded Brown's vehicle, the parked car may have caused motorists in the right-hand lane to have to reduce speed or change lanes, and worse yet, it may have caused a collision.

---

[13] *Kendall*, 14 F.4th at 1123 (citing *United States v. Sanders*, 796 F.3d 1241, 1248 (10th Cir. 2015)).

[14] *Id.* (quoting *Sanders*, 796 F.3d at 1250).

[15] *United States v. Ramos*, No. 23-6071, 2023 U.S. App. LEXIS 33173, 2023 WL 8658839, at *4 (10th Cir. Dec. 15, 2023) (citations omitted). The Court cites unpublished decisions of the Tenth Circuit for their persuasive value, consistent with Tenth Cir. R. 32.1 and Fed. R. App. P. 32.1.

Next, even if Brown's vehicle had not posed a safety hazard or traffic impediment, the balance of the *Sanders* factors weighs in favor of finding a reasonable, non-pretextual community-caretaking rationale justifying impoundment. Brown's vehicle was on a public road, and there were no apparent alternatives to impoundment because the keys to the vehicle were missing when Trooper Eads made the decision to impound the vehicle.[16] Further, Brown's vehicle was implicated in criminal activity since he reentered the vehicle after fleeing from law enforcement.[17] Although Brown did not consent to the impoundment, the other factors all weigh in favor of impoundment.

Brown also argues that Trooper Eads' impoundment violated the Fourth Amendment by not complying with OHP and OCPD impoundment procedures. First, "standardized procedures need not . . . justify impoundments" of vehicles threatening public safety.[18] Moreover, Brown did not establish that Trooper Eads' decision to impound the car violated any procedure, but merely that Trooper Eads failed to fill out an inventory form after he searched the car. That failure to fill out a form does not render the decision to impound the car illegal.

---

[16] Brown's brother testified that he lived about 10 minutes from the scene and would have driven to the scene get the car if called. But because the vehicle could not be started due to the missing key, it was not unreasonable for Trooper Eads to conclude that towing the car was the only viable option.

[17] When asked at the hearing if the vehicle was evidence of any crime, Trooper Eads said no. But Brown was charged with a crime for his flight from Trooper Eads, and his attempt to leave the scene in his car certainly implicated the car in that crime.

[18] *Sanders*, 796 F.3d at 1249.

*III. Search of Brown's Vehicle*

Finally, Brown argues that Trooper Eads violated his Fourth Amendment rights by searching his vehicle contrary to OHP and OCPD procedures.

An officer may conduct either an inventory search or a community-caretaking search of a to-be impounded vehicle. An inventory search "does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'"[19] A community-caretaking search is permissible if "justified by concern for the safety of the general public who might be endangered if an intruder removed a weapon which police reasonably believed was present and located in a part of the vehicle vulnerable to vandals."[20] Under either rationale, "the officers' actions in undertaking the search 'must be reasonably related in scope to the underlying justification.'"[21]

Trooper Eads' search of Brown's vehicle was permissible as a community-caretaking search. Before the vehicle search, Trooper Eads observed what he believed to be a handgun holster on Brown's waist. He also observed Brown flee from the site of the traffic stop across Interstate 40. Later, when the officers searched Brown after his arrest, the suspected holster was missing, suggesting he was attempting to conceal it from law enforcement. Together, these observations gave rise to a reasonable belief that a firearm

---

[19] *Kendall*, 14 F.4th at 1124 (quoting *United States v. Lugo*, 978 F.2d 631, 636 (10th Cir. 1992)).

[20] *Id.* at 1127 (quoting *Lugo*, 978 F.2d at 635).

[21] *Id.* (quoting *United States v. Neugin*, 958 F.3d 924, 931 (10th Cir. 2020)).

was in Brown's vehicle, justifying a search of both the front seat area and the trunk of the vehicle.[22]

Brown argues that Trooper Eads' search of the vehicle was an improper inventory search because the search did not comport with applicable OHP and OCPD procedures. But even if a search cannot be justified as an inventory search, it can still be a valid community-caretaking search.[23] Because the search was justified under the latter rationale, the Court need not determine whether the search was a permissible inventory search.

### *Conclusion*

Accordingly, the Court **DENIES** Defendant Brown's Motion to Suppress (Dkt. 30).

**IT IS SO ORDERED** this 12th day of February 2024.

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

---

[22] *See id.* at 1127 (upholding a community-caretaking search of the interior panel of a vehicle where officers previously found an empty handgun holster on the front passenger seat of the vehicle and observed the defendant "moving around a lot in a very erratic and concerning way and moving objects around on the passenger seat, kind of in a frantic motion") (citations and internal quotation marks omitted); *Cady v. Dombrowski*, 413 U.S. 433, 448 (1973) ("Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not 'unreasonable' within the meaning of the Fourth . . . Amendment[].").

[23] *See Kendall*, 14 F.4th at 1127 ("Unlike the center-console search, Officer Cotten's search of the interior panel beneath the glove box cannot be justified as an inventory search. Nonetheless, we uphold the search as reasonable because it was justified as an exercise of the officers' community-caretaking function.").